# FOR PUBLICATION



ATTORNEY FOR APPELLANT:

**ELIZABETH A. BELLIN**
Cohen Law Offices
Elkhart, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JAMES B. MARTIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DAQUAN WHITENER, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 20A04-1205-CR-254 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ELKHART SUPERIOR COURT
The Honorable Stephen R. Bowers, Judge
Cause No. 20D02-0908-FA-3

**February 14, 2013**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

Daquan Whitener appeals his conviction for burglary as a class A felony and the trial court's determination that he register as a sex offender as a condition of probation. Whitener raises two issues which we revise and restate as:

    I.       Whether the evidence is sufficient to sustain his conviction for burglary as a class A felony; and

    II.     Whether the court erred in ordering that he register as a sex offender as a condition of probation.

Additionally, the State raises an issue on cross-appeal, namely, whether the court properly declined to enter a judgment of conviction for rape as a class B felony based upon double jeopardy principles. We affirm.

The facts most favorable to the conviction follow. On August 5, 2009, K.A.[1] was at her home with her three children in Elkhart County, Indiana, and over the course of the afternoon her mother, Laura Jackson, Holly Meyers, and Raquel Pizana arrived to visit. K.A.'s mother spent most of the afternoon inside with K.A.'s children while the four women socialized outside in the backyard. At some point in the afternoon or evening, the women decided that they wanted to drink alcohol. Also, at one point Meyers phoned Whitener, who was seventeen years old at the time, and asked if he could return a CD which belonged to Pizana and bring it to K.A.'s home. Whitener arrived along with his cousin Anthony Wheeler. K.A. had not previously met Whitener or Wheeler. When Whitener arrived, K.A. and Jackson were inside, and Whitener and Wheeler talked

---

[1] Although this appeal stems from a burglary conviction, as charged the underlying felony Whitener intended to commit was rape, which is a form of sexual assault, and accordingly we anonymize the victim's name.

outside with Meyers and Pizana. Whitener and Wheeler left the home with Pizana without speaking to K.A.

Whitener and Wheeler later returned to K.A.'s home and again spoke in the backyard with Meyers and Pizana and finished a bottle of gin, and Pizana called K.A. to the back door and asked if she would go with Pizana, Whitener, and Wheeler to the liquor store to purchase more alcohol. Before driving to the liquor store they stopped by another home and picked up Telvon Whitener, who was thirteen or fourteen years old and was another cousin of Whitener's. When they arrived at the liquor store, K.A. went inside, purchased a bottle of gin, and then returned to the car and they left. When they returned to K.A.'s home, K.A. went inside to attempt "to get rid of [her] mom" while the others went into the backyard. Transcript at 145. Around 8 p.m., after K.A.'s mother left, K.A. asked Pizana to drive her to Kroger to purchase liquor for herself, and again K.A., Pizana, Whitener, and Wheeler traveled together to purchase alcohol. During this time, Jackson stayed at the home to watch K.A.'s children and Meyers was in her car talking on the phone.

While in Pizana's vehicle, for the most part the people in the car listened to the radio and did not speak to each other. First, the vehicle went to a gas station so Whitener could purchase "a black and mild," and then they proceeded to Kroger. K.A. and Pizana went inside, purchased a bottle of vodka, and then drove back to K.A.'s home. Id. at 147. K.A. did not speak with Whitener while they were in the car.

When they returned, Whitener, Telvon, and Wheeler sat at the kitchen table while K.A., Jackson, and Pizana sat in the living room on the couch.[2] K.A. and Jackson began to raise the issue with Pizana that they did not "feel comfortable with [the boys] there cause [sic] [they] didn't know how old they were but [they] knew that they were young," and they told Pizana that they did not want the boys to be there. Id. at 151. Eventually, the three boys left with Pizana, but before they left K.A. asked Whitener if she could use his phone because she did not have her own phone. That brief conversation was the only time K.A. spoke with Whitener that evening.

After they left, Jackson told K.A. that she should keep drinking because K.A. did not have the opportunity to do so very often due to her children, Jackson assured K.A. that she would watch her children, and K.A. "drank a lot." Id. at 154. At some point in the night they returned, and at around 1 a.m. Pizana drove Jackson, Whitener, Telvon, and Wheeler away from K.A.'s home. K.A. fell asleep on the couch and did not remember Jackson and Pizana leaving. Pizana observed that K.A. was "really, really drunk," noting that she was stumbling and slurring her words. Id. at 86. Pizana dropped Jackson off at her home and then drove the three boys to another residence and dropped them off.

They stayed at that house for a couple of minutes and then walked to Whitener's house which took about five or ten minutes. While at Whitener's house, Whitener went upstairs and then came back downstairs and stated to Wheeler and Telvon that he was going to go back to K.A.'s house because "he remembered that she said she wanted to

---

[2] Meyers left at one point because she had to work.

have sex with him," although Wheeler did not hear K.A. state this to Whitener. Id. at 283. After staying at Whitener's house for "a minute," the three of them walked back to K.A.'s house. Id. at 284.

As they were arriving at K.A.'s home, Whitener explained to Telvon and Wheeler that K.A. told Whitener to enter through a living room window because "she had child safety locks on her door." Id. at 285. Whitener lifted up the screen in the window, pulled back the window, pushed in a fan which was blocking the window and crawled through. K.A. awoke and observed her "fan going down in [her] window." Id. at 156. Whitener then went to the back door and let Wheeler and Telvon into the home. K.A. did not react to the fan initially because she was "too drunk" and was "going in and out, blacking out," but she observed "a couple people in [her] house" and recognized Telvon and Whitener. Id. at 157-158.

Once inside, Whitener asked Telvon to "try to talk to her" and to "[k]iss on her neck a little bit or whatever." Id. at 250. Telvon kissed K.A. on the neck and pulled K.A.'s pants down, but she told him to stop and he did not have sex with her. At one point Whitener moved Telvon aside and told Telvon that "you don't know what you're doing." Id. at 258. K.A. observed Whitener, who was "real close" to her face and had his penis in his hand, and both Whitener and Telvon were telling her that it was "alright." Id. at 159. Whitener put a condom on and had sex with K.A. During intercourse, K.A. was crying and attempting to push Whitener off of her and cried out for Jackson to help because she thought Jackson was still at her house. After Whitener finished having sex he asked Wheeler "do you want a turn man," but Wheeler declined. Id. at 261. They

5

then left through the back door, but before Whitener left he discarded the condom. After they left, K.A. "stumbled to the back door, pushed it all the way shut and locked it," and then she went back into the living room and fed her baby, who had been in the living room in her car seat next to the couch during this time. K.A. started crying and eventually fell asleep. Id. at 162.

The next morning, K.A. awoke to her mother knocking on her door, and her mother asked why her window was pried open. Soon after, Jackson came over to K.A.'s house and observed K.A. looking "kind of traumatized and . . . crying and her hair was messed up and here [sic] mom was screaming," and K.A. then started telling Jackson what had occurred. Id. at 114. K.A. called the police and Officer Bruce Anglemyer responded and took photographs of the home and transported K.A. to the hospital to have a rape kit done. K.A. noticed that her vaginal area was sore to the point that she "couldn't wear pants" or "wipe" and that her "pad was hurting [her] cause [sic] it kept rubbing up against [her]." Id. at 167. K.A. noticed while at the hospital that she had bruises on her leg and back which she did not recognize before the previous night, and also that she had a "hickey" on her neck that had not been present before. Id. at 169.

On August 28, 2009, the State charged Whitener with Count I, burglary as a class A felony; and Count II, rape as a class B felony. The court held a jury trial which commenced on March 23, 2010. At trial, K.A. testified that she did not ask Whitener to return to her home that night, did not ask him to climb through the window, and did not ask him to have sex with her. K.A. testified that she did not call the police that night because she did not have a phone and did not want to go outside. Wheeler and Telvon

6

both testified that Whitener had consensual sex with K.A. and that Telvon did not have sex with her.

Corporal James Peterson of the Elkhart Police Department testified that he collected "buckle swab standards" from Telvon and Whitener. Id. at 299. Officer Dan Milanese testified that he collected a condom and condom wrapper, located in the kitchen trash can, from K.A.'s home, and photographic evidence of the condom was admitted into evidence. Jamie Lynn Rice, a registered nurse at Elkhart General Hospital, testified that she performed a sexual assault exam on K.A. and that K.A. told Rice that "she was very sore in her vagina . . . she was swollen . . . the external labia of her vagina and uhm, very red." Id. at 349. Rice testified that K.A. had a red mark on the right side of her neck, swelling on her labia majora, a scratch to her knee, and a bruise on her back and longer scratch above the bruise. Detective Carlton Conway testified that he interviewed Whitener and Telvon and that Whitener voluntarily gave a statement in which he admitted that he had sex with K.A., that K.A. told him to climb through the window, and that although she did not say specifically that she wanted to have sex "he knew what she meant." Id. at 395. Detective Conway also indicated that Whitener stated that he did not believe K.A. was intoxicated when they had sex, and testified that Whitener told him that he put a condom on to have sex with K.A. Lori Healey, a forensic scientist with the Indiana State Police who tested the recovered evidence, testified that DNA on the condom revealed that Whitener could not be excluded as a contributor and that Telvon and Wheeler could both be excluded. Healey also testified that a DNA swab sample from K.A.'s neck revealed that neither Whitener nor Telvon could be excluded as contributors.

7

On March 25, 2010, the jury found Whitener guilty as charged. On April 19, 2010, the court held a sentencing hearing and *sua sponte* vacated Count II, finding that there was a reasonable possibility that the same evidentiary facts were relied upon by the jury in convicting Whitener on both Counts I and II. The court sentenced Whitener to twenty-five years with five years suspended to probation. The court also ordered that Whitener register as a sex offender.

On April 23, 2010, Whitener filed a motion to correct error stating that the court's order requiring him to register as a sex offender pursuant to Ind. Code § 11-8-8-4.5 was error because his sole conviction was for burglary as a class A felony which is not one of the enumerated offenses in the statute. On April 28, 2010, the State filed a motion to correct error stating that the court erred when it "held that the State was required to prove aggravating circumstances to a jury" and in vacating Count II based upon double jeopardy grounds. Appellant's Appendix at 97. On May 10, 2010, the court held a hearing on the motions to correct error and denied the State's motion to the extent that it asked the court to reinstate a conviction on Count II and granted Whitener's motion with respect to the order that he register as a sex offender. The court also granted the State's motion with respect to aggravators and mitigators, proceeded to resentencing, and sentenced Whitener to forty years with fifteen years suspended to probation. The court also ordered that Whitener register as a sex offender as a condition of probation.

On April 9, 2012, Whitener filed a petition for leave to file a belated notice of appeal pursuant to Ind. Post-Conviction Rule 2(1). On April 17, 2012, the court granted his petition, and on May 16, 2012, Whitener by counsel filed a notice of appeal.

The first issue is whether the evidence is sufficient to sustain Whitener's conviction for burglary as a class A felony. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. Jordan v. State, 656 N.E.2d 816, 817 (Ind. 1995), reh'g denied. Rather, we look to the evidence and the reasonable inferences therefrom that support the verdict. Id. We will affirm the conviction if there exists evidence of probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. Id. The uncorroborated testimony of one witness, even if it is the victim, is sufficient to sustain a conviction. Ferrell v. State, 565 N.E.2d 1070, 1072-1073 (Ind. 1991).

The offense of burglary as a class A felony is governed by Ind. Code § 35-43-2-1, which provides that "[a] person who breaks and enters the building or structure of another person, with intent to commit a felony in it, commits burglary, a Class C felony. However, the offense is . . . a Class A felony if it results in: (A) bodily injury; or (B) serious bodily injury; to any person other than a defendant." Here, the State alleged in its charging information that Whitener:

> Did break and enter the building or structure of another person, to wit: the residence of [K.A.], with intent to commit a felony therein, to wit: Rape, that is to knowingly have sexual intercourse with a member of the opposite sex and the person was compelled by force or the imminent threat of force, which conduct resulted in bodily injury, to wit: an impairment to the physical condition of the said [K.A.] . . . .

Appellant's Appendix at 233. Thus, to convict Whitener of burglary as a class A felony, the State needed to prove that he broke and entered K.A.'s residence with the intent to commit rape and that K.A. suffered an impairment to her physical condition.

Whitener argues that the State failed to prove the elements of burglary because "there was inadequate evidence presented at trial to establish that [Whitener] entered [K.A.'s] apartment with the requisite intent to force [her] to have sexual intercourse with him." Appellant's Brief at 10. Whitener argues that at trial, Telvon and Wheeler both testified that Whitener indicated to them that K.A. told him to come back to her home and to enter through the front window that was open because the front door had child safety locks on the handle. Whitener argues that K.A. "could not remember much of what happened," noting that she "could not testify for certain that [Whitener] even had sexual intercourse with her, let alone whether said act was the result of a consensual encounter . . . ." Id. at 12. Whitener also argues that there was insufficient evidence to show that K.A. sustained bodily injury as a result of his actions, noting that K.A. could not attribute the marks on her leg and back directly to Whitener, and the mark on her neck "was a result of the separate act of Telvon [] kissing her neck . . . ." Id. at 13.

The State argues that Whitener "lifted up the screen in the window, pulled back the window, and pushed in the fan that was blocking the window" which satisfies the breaking and entering element. Appellee's Brief at 15. The State argues that Whitener "expressly intended to return to [K.A.'s] house to have sex with her." Id. The State argues that Whitener knew that K.A. did not have a phone and notes that K.A. testified that she did not invite Whitener to return or consent to having sex. The State argues also that the method of entering a home can evidence one's intent to commit a violent attack and that Whitener's entry by the window was evidence of such. The State argues that Whitener's behavior while inside K.A.'s home is further evidence of intent, noting that he

encouraged Telvon to have sex with her and asked Wheeler whether he wanted to have sex with her. The State also argues that evidence supports the verdict that K.A. suffered bodily injury as a result of Whitener's breaking and entering including "significant swelling, bruising, redness, soreness and pain in her vaginal area" as well as "bruising on her back, bruising and scratches on her knee, scratches on her buttock and hip area, and ecchymosis, or bruising, on her neck." Id. at 16.

To the extent that Whitener suggests that the State failed to prove intent, we observe that evidence of intent "need not be insurmountable," Gilliam v. State, 508 N.E.2d 1270, 1271 (Ind. 1987), reh'g denied, but there must be a "specific fact that provides a solid basis to support a reasonable inference that the defendant had the specific intent to commit a felony." Freshwater v. State, 853 N.E.2d 941, 944 (Ind. 2006). The evidentiary inference pointing to the defendant's intent must be separate from the inference of the defendant's breaking and entering. Justice v. State, 530 N.E.2d 295, 297 (Ind. 1988); Kondrup v. State, 250 Ind. 320, 323, 235 N.E.2d 703, 705 (1968). "The inference of intent must not derive from or be supported by the *inference* of breaking and entering." Baker v. State, 968 N.E.2d 227, 230 (Ind. 2012). "In other words, the evidence must support each inference—felonious intent and breaking and entering—independently, and neither inference should rely on the other for support." Id. "This is not to say, however, that the same piece of evidence cannot support both inferences." Id.

Here, the facts most favorable to the conviction reveal that Whitener spent most of the evening at K.A.'s home and was aware of the fact that she had been drinking heavily, and that when they left K.A.'s home around 1 a.m. K.A. was "really, really drunk," and

was stumbling and slurring her words. Transcript at 86. Whitener also was aware that K.A. did not have a working phone. After leaving K.A.'s home, Whitener, Wheeler, and Telvon arrived at Whitener's house, and Whitener stated that he was going back to K.A.'s home because she wanted to have sex with him. They walked to K.A.'s, and when they arrived Whitener approached the living room window, lifted up the screen in the window, pulled back the window, pushed in a fan which was blocking the window and crawled through. Whitener found K.A., who had been sleeping, on her couch, and she was drunk and "going in and out, blacking out." Id. at 157. He then went to the back door and let the other two into the home. Whitener first encouraged Telvon to kiss K.A., but he later moved Telvon aside, telling Telvon that "you don't know what you're doing," put on a condom, and had sex with K.A. Id. at 258. During intercourse, K.A. was crying and attempting to push Whitener off of her and cried out for help from Jackson who she thought was still at her house. After finishing, Whitener asked Wheeler "do you want a turn man," but Wheeler declined. Id. at 261. K.A. sustained injuries including soreness on her vaginal area to the point that she "couldn't wear pants" or "wipe" and that her "pad was hurting [her] cause [sic] it kept rubbing up against [her]." Id. at 167. An examination at the hospital revealed that K.A. had bruises on her leg and back as well as a "hickey" on her neck. Id. at 169.

Whitener's argument is essentially a request that we reweigh the evidence or judge the credibility of witnesses, which we cannot do. Jordan, 656 N.E.2d at 817. We conclude that the State presented evidence of a probative nature from which a reasonable

trier of fact could have found beyond a reasonable doubt that Whitener's entry of K.A.'s home was unauthorized and that he was guilty of burglary as a class A felony.

II.

The next issue is whether the court erred in ordering that Whitener register as a sex offender as a condition of probation.  Probation is a criminal sanction where the convicted offender agrees to accept conditions upon his behavior in lieu of incarceration. Gaither v. Ind. Dep't of Correction, 971 N.E.2d 690, 694 (Ind. Ct. App. 2012).  A trial court has broad discretion to impose conditions of probation, with the only limitation being that the conditions have a reasonable relationship to the treatment of the accused and the protection of the public.  Id.  The reviewing court is limited to considering whether the conditions imposed by the court on the accused aid in the furtherance of the goal of "assuring that the probation serves as a period of genuine rehabilitation and that the community is not harmed by a probationer being at large."  Id.  We will not set aside terms of probation unless the trial court abused its discretion.  Id.  An abuse of discretion occurs where the decision is "clearly against the logic and effects of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom."  Anglemeyer v. State, 868 N.E.2d 482, 490 (Ind. 2007), clarified on reh'g, 875 N.E.2d 218 (Ind. 2007).

Whitener begins by reciting Ind. Code § 11-8-8-4.5, the relevant provision defining "sex offender" for purposes of Indiana's Sex Offender Registration, and argues that although he "does not dispute that if he were convicted of Rape as a class B felony he would meet the criteria for having to register as a sex offender . . . . [his] conviction

13

for Rape in Count II was vacated . . . ." Appellant's Brief at 15. Whitener argues that "[w]hen looking at the statute outlining the crimes for which a person is required to register as a sex offender, Burglary is not listed" and he "would need to have been convicted of Rape as a separate and distinct act for the statute to apply in the instant matter." Id.

The State argues that the trial court was within its discretion to order that Whitener register as a sex offender as a condition of probation and that the court did not abuse its discretion in doing so. The State argues that because the order was a condition of probation and not a statutory requirement, "a violation . . . would [] be punishable as a probation violation and [Whitener] would not be subject [to] prosecution for violation of Ind. Code § 11-8-8-17."[3] Appellee's Brief at 18.

In Weiss v. Ind. Parole Board, defendant Weiss was convicted of aggravated battery, and "[s]hortly after Weiss was paroled, his parole agent recommended that he be required to adhere to the standard and special sex offender parole conditions[4] in addition

---

[3] The State also suggests that this issue is moot because the court erred in vacating Whitener's rape conviction. We address this issue in part III.

[4] Ind. Code § 11-13-3-4(g), as currently constructed, provides in part:

(g)    As a condition of parole, the parole board:

   (1)    may require a parolee who is a sex offender (as defined in IC 11-8-8-4.5) to:

      (A)    participate in a treatment program for sex offenders approved by the parole board; and

      (B)    avoid contact with any person who is less than sixteen (16) years of age unless the parolee:

         (i)    receives the parole board's

14

to the standard parole conditions" because his crime involved "raping a minor and leaving her for dead," and "these additional requirements would protect society and encourage rehabilitation." 838 N.E.2d 1048, 1049 (Ind. Ct. App. 2006) (internal quotations omitted), trans. denied. Weiss challenged the imposition of the sex offender parole conditions, arguing in part that the Indiana Parole Board was prohibited from imposing the sex offender conditions on a parolee not convicted of an offense listed in the statute defining sex offender, and the court dismissed his claim pursuant to Ind. Trial Rule 12(B)(6). Id. at 1050.

---

               approval; or

(ii)      successfully completes the treatment program referred to in clause (A); and

(2)     shall:

    (A)     require a parolee who is a sex or violent offender (as defined in IC 11-8-8-5) to register with a local law enforcement authority under IC 11-8-8;

    (B)     prohibit a parolee who is a sex offender from residing within one thousand (1,000) feet of school property (as defined in IC 35-31.5-2-285) for the period of parole, unless the sex offender obtains written approval from the parole board;

    (C)     prohibit a parolee who is a sex offender convicted of a sex offense (as defined in IC 35-38-2-2.5) from residing within one (1) mile of the victim of the sex offender's sex offense unless the sex offender obtains a waiver under IC 35-38-2-2.5; . . . .

We observe that this statute differs from the version recited in Weiss in that Ind. Code §§ 5-2-12, which related to sex offender registration in Indiana, was repealed by Pub. L. No. 140-2006, § 41, and Pub. L. No. 173-2006, § 55, and the current statute reflects that the sex offender registration is governed by Ind. Code §§ 11-8-8, among other revisions not pertinent in this matter.

On appeal, this court noted that the statutes as constructed did not prohibit imposing the sex offender conditions on offenders such as Weiss and that "[a]lthough [he] was not convicted of a sex offender crime, he pled guilty to aggravated battery of a minor" and he "does not deny that the battery to the minor also involved the rape of her." Id. at 1051-1052. We observed that Ind. Code § 11-13-3-4(b) granted the parole board "general authority to impose additional conditions beyond the standard conditions for a person on parole as long as the conditions are reasonably related to the parolee's successful reintegration into the community and not unduly restrictive of a fundamental right." Id. at 1051. The court held that "[t]hese acts are a significant part of his social interaction history that should be taken into account when determining what conditions would aid his re-entry to society" and that "[b]ecause his crime involved a sexual act with a child, the imposition of the sex offender conditions are reasonably related to Weiss's reintegration into the community." Id. at 1052.

Just as the parole board is vested with discretion in setting conditions of parole, as noted above trial courts are given broad discretion in fashioning conditions of probation, and we find that the reasoning in Weiss applies with equal force here to Whitener's probation. Indeed, we note that this court has previously stated that "[p]arole and probation conditions may be viewed together because 'a person on probation occupies a status similar to that of a person on parole.'" Gaither, 971 N.E.2d at 694 (quoting Carswell v. State, 721 N.E.2d 1255, 1262 (Ind. Ct. App. 1999)). "[T]he only practical difference between the two is that 'probation' relates to judicial action taken before the

prison door is closed, whereas 'parole' relates to executive action taken after the door has closed on a convict." Id.

Ind. Code § 35-38-2-2.3 (Supp. 2009) governs the conditions of Whitener's probation. At the time of Whitener's sentencing, the relevant version of Ind. Code § 35-38-2-2.3 provides in part that "(a) As a condition of probation, the court may require a person to do a combination of the following: . . . (14) Satisfy other conditions reasonably related to the person's rehabilitation."[5] Although Whitener was convicted and sentenced on a count of burglary as a class A felony, which is not an enumerated offense under Ind. Code § 11-8-8-4.5(a) (Supp. 2007),[6] the underlying felony he intended to commit when committing the burglary was rape, which is an enumerated offense. Moreover, we note that Whitener was found guilty of committing rape as a class B felony by the jury, and the court vacated his conviction based upon double jeopardy principles. Thus, much as the defendant in Weiss, Whitener's crime involved the act of raping K.A., and it was within the court's discretion under the facts of this case to order that he register as a sex offender as a condition of probation as reasonably related to his rehabilitation. Accordingly, we conclude that the court did not abuse its discretion in ordering that he register as a sex offender as a condition of probation. See Hale v. State, 888 N.E.2d 314,

---

[5] As noted above, the court sentenced Whitener in May 2010 following the hearing on the motions to correct error and ordered that Whitener register as a sex offender as a condition of probation. Ind. Code § 35-38-2-2.3 has subsequently been amended by Pub. L. No. 40-2012, § 20 (eff. July 1, 2012), and Pub. L. No. 147-2012, § 9 (eff. July 1, 2012). The relevant subparagraph in the current statute is listed as subparagraph (15).

[6] Section 4.5(a) provides a list of offenses and states that a person who is convicted of any such enumerated offense is a "sex offender," and it lists rape as one such offense but does not include burglary with the intent to commit rape or other enumerated offense. Ind. Code § 11-8-8-4.5(a) (Supp. 2007) (subsequently amended by Pub. L. No. 1-2012, § 2 (eff. Jan. 30, 2012); Pub. L. No. 72-2012, § 1 (eff. July 1, 2012)).

17

319 (Ind. Ct. App. 2008) (holding that condition of probation that the defendant's driver's license be suspended for a period of ten years was reasonably related to his rehabilitation and noting that it "is consistent with the trial court's broad discretion in imposing conditions of probation in order to create law-abiding citizens and to protect the community with the only limitation being that the conditions have a reasonable relationship to the treatment of the accused and the protection of the public" and that the reviewing court "is essentially limited to determining whether the conditions placed upon the defendant are reasonably related to attaining these goals") (internal quotations omitted), trans. denied.

### III.

The issue raised by the State on cross-appeal is whether the court properly declined to enter a judgment of conviction for rape as a class B felony based upon double jeopardy principles. However, before we can address the merits of this issue, we must first discuss whether the State may raise this issue. As noted above, on April 19, 2010, at Whitener's sentencing hearing, the court vacated Count II, noting that it merged into Count I for sentencing. On April 28, 2010, the State filed a motion to correct error which stated in part that the court erred in vacating Whitener's conviction on Count II. On May 10, 2010, following a hearing, the court denied the State's motion in relevant part. Neither Whitener nor the State filed a notice of appeal in 2010, and in April 2012 the court granted Whitener's petition to file a belated notice of appeal pursuant to Ind. Post-Conviction Rule 2(1).

18

Initially, we observe that the State's authority to appeal criminal matters is extremely limited and is statutory in nature and that "the State cannot appeal unless given that statutory authorization by the legislature." State v. Coleman, 971 N.E.2d 209, 211 (Ind. Ct. App. 2012) (citing State v. Brunner, 947 N.E.2d 411, 415 (Ind. 2011), reh'g denied). Also, "[t]he State's statutory right of appeal is in contravention of common law principles and is therefore strictly construed." Id. (citing State v. Pease, 531 N.E.2d 1207, 1208 (Ind. Ct. App. 1988)). Specifically, Ind. Code § 35-38-4-2, titled "Appeals by state as provided by court rules for certain cases," provides that appeals to this court or the Indiana Supreme Court may be taken by the State in the following cases:

(1) From an order granting a motion to dismiss an indictment or information.

(2) From an order or judgment for the defendant, upon his motion for discharge because of delay of his trial not caused by his act, or upon his plea of former jeopardy, presented and ruled upon prior to trial.

(3) From an order granting a motion to correct errors.

(4) Upon a question reserved by the state, if the defendant is acquitted.

(5) From an order granting a motion to suppress evidence, if the ultimate effect of the order is to preclude further prosecution.

(6) From any interlocutory order if the trial court certifies and the court on appeal or a judge thereof finds on petition that:

  (A) the appellant will suffer substantial expense, damage, or injury if the order is erroneous and the determination thereof is withheld until after judgment;

  (B) the order involves a substantial question of law, the early determination of which will promote a more orderly disposition of the case; or

> (C) the remedy by appeal after judgment is otherwise inadequate.

This rule applies with equal force when the State raises an issue by way of cross-appeal. See Hardley v. State, 905 N.E.2d 399, 401 (Ind. 2009) (observing that generally Ind. Code § 35-38-4-2 applies to claims raised by the State including claims raised by cross-appeal as was the case therein).

We also observe that in Hardley the Court held that, in addition to the circumstances enumerated in Ind. Code § 35-38-4-2, there is an additional circumstance in which the State may appeal in criminal cases where, as a pure matter of law, the trial court's sentence is claimed to be illegal. 905 N.E.2d at 404. The Court determined that Ind. Code § 35-38-1-15 implicitly grants the State authority to challenge erroneous sentences and reasoned that "sound policy and judicial economy favor permitting the State to present claims of illegal sentence on appeal when the issue is a pure question of law that does not require resort to any evidence outside the appellate record." Id. at 403. The Court noted that such a challenge need not be brought within thirty days of a final judgment because "[t]here is no requirement that a motion to correct a sentence under [Ind. Code] § 35-38-1-15 must be made within thirty days of the final judgment" and "the State's appellate challenge is the substantial equivalent of the motion to correct erroneous sentence . . . ." Id.

The Court applied this principle in another case in which the defendant petitioned the trial court to modify his conviction for operating under the influence from a class D felony to a class A misdemeanor which the court granted. Brunner, 947 N.E.2d at 414. The Court held that the State "timely appealed a judgment entered by the trial court"

which the court did not possess statutory authority to do and that under those circumstances, in which the issue was "a pure question of law that does not require evidence outside the record . . . the State has the limited availability to appeal a trial court's modification of conviction under these particular circumstances." Id. at 415-416. We note, however, that the statement in Hardley that such an appeal need not be filed within thirty days based upon Ind. Code § 35-38-1-15 was not applicable in this circumstance.

We turn next to State v. Holtsclaw, in which the Court addressed whether Ind. Appellate Rule 9 applied to the State in tolling the thirty-day deadline for filing a notice of appeal when a party files a motion to correct error. 977 N.E.2d 348, 349 (Ind. 2012). In Holtsclaw, following the trial court's May 23, 2011 grant of the defendant's motion to suppress evidence, the State on June 21, 2011 filed a motion to correct error which the court denied on July 25. Id. On August 16, 2011, the State appealed the court's suppression ruling, and the defendant argued that the appeal was untimely and not authorized by statute because Ind. Code § 35-38-4-2 does not allow for appeals by the State stemming from the *denial* of a motion to correct error. Id. at 349-350. The State argued that Ind. Appellate Rule 9, which tolls the thirty-day filing deadline "if any party files a timely motion to correct error[,] . . . took precedence over Ind. Code § 35-38-4-2 and thus its appeal was timely." Id. at 350. The Court agreed, noting that "[o]ur 'rules of procedure prevail over any statute or statutory construction'" and "in this conflict between Indiana Code § 35-38-4-2 and our Appellate Rule 9, the former must give way to the latter." Id. (quoting State ex rel. Crawford v. Del. Cir. Ct., 655 N.E.2d 499, 500

(Ind. 1995)). It held that pursuant to Ind. Appellate Rule 9 the State had until August 24, 2011, to appeal from the denial of its motion to correct error, and that accordingly its appeal was timely. Id.

Here, by contrast, following the court's denial of the State's motion to correct error on May 10, 2010, the State elected not to appeal. It was two years later, after Whitener pursued a direct appeal by filing a petition to file a belated appeal pursuant to Ind. Post-Conviction Rule 2(1), that the State elected to raise this issue. We conclude that, under these circumstances, the State's cross-appeal issue is untimely, and accordingly we dismiss the State's appeal.[7]

---

[7] We acknowledge that this court has previously observed that if a trial court grants a petition to file a belated notice of appeal, "the 'notice of appeal shall be treated for *all purposes* as if filed within the prescribed period.'" Beatty v. State, 854 N.E.2d 406, 409 (Ind. Ct. App. 2006) (quoting Post-Conviction Rule 2(1) (subsequently amended on Sept. 10, 2007 (eff. Jan. 1, 2008), Sept. 9, 2008 (eff. Jan. 1, 2009, Sept. 20, 2011 (eff. Jan. 1, 2012))), reh'g denied. However, the September 10, 2007 amendment, effective on January 1, 2008, revised Ind. Post-Conviction Rule 2(1) and included Rule 2(1)(f) which altered language governing the timing requirements and specifically stated that notices of appeal shall comply with the timing requirements of Ind. Appellate Rule 9(A). Currently, Ind. Post-Conviction Rule 2(1)(f), titled "*Time and procedure for initiating appeal*," states that "[i]f the court grants permission to file a belated notice of appeal, the time and procedure for filing such notice of appeal is governed by App. R. 9(A)." To the extent that the rule expressed in Beatty might have rendered timely the State's cross-appeal motion following Whitener's belated notice of appeal, we observe that the current version of Post-Conviction Rule 2(1) does not contemplate that filing of a belated notice of appeal would allow for cross-appeal issues to be filed by the State as cross-appeals are sought pursuant to Ind. Appellate Rule 9(D). Where the State has appealable issues following a final judgment, it should raise them in a timely fashion or forfeit its opportunity.

We also note that, in Beatty, this court was addressing whether the State could raise on cross-appeal the question of whether the post-conviction court abused its discretion when it allowed the defendant to file a belated notice of appeal. As the Beatty court noted, the defendant's argument that Ind. Code § 35-38-4-2 precluded the State's cross-appeal was erroneous because "a petition to file a belated notice of appeal is authorized and governed by the Post-Conviction Rules; consequently, the proceeding herein is properly characterized as a *post-conviction* proceeding rather than a *criminal* proceeding." 854 N.E.2d at 409 (citing State v. Lawson, 272 Ind. 541, 400 N.E.2d 128, 128-129 (1980)) (emphases added). Thus, the court held "the State's right to cross-appeal from an order granting such a petition is governed by rule rather than statute." Id. Where the State challenges on cross-appeal the post-conviction court's decision to allow the defendant to file a belated notice of appeal, it is appealing a ruling made at a post-conviction proceeding, rather than from a direct criminal appeal, and accordingly the limitations imposed by Ind. Code § 35-38-4-2 do not apply to bar the State from bringing that issue.

Finally, to the extent that the principle in Hardley that the State may seek review of pure questions of law in which such review would not require evidence outside the record might apply to the instant case, we observe that the Indiana Supreme Court has made clear that a double jeopardy challenge is not a challenge to a defendant's sentence. In McCullough v. State, the defendant on direct appeal raised claims of "insufficient evidence and double jeopardy *but does not seek appellate review of his sentence.*" 900 N.E.2d 745, 746 (Ind. 2009) (emphasis added). The State raised by cross-appeal a challenge to the sentence imposed by the trial court, seeking either a remand for resentencing due to the alleged inadequacy of the sentencing statement or, alternatively, requesting that the defendant's sentence be revised by the appellate court and a longer sentence be imposed. Id. at 750. The Court held that "the State may not by appeal or cross-appeal (a) initiate a challenge to a trial court's criminal sentence that is within the court's sentencing authority or (b) seek appellate review and revision of such sentence," unless the "defendant requests appellate review and revision of a criminal sentence pursuant to authority derived from Article 7, Sections 4 or 6 of the Indiana Constitution," and that in that case the State was precluded from raising the issue on appeal. Id. at 750-751. Thus, despite the fact that the defendant raised a double jeopardy claim, the Court reasoned that the defendant did not challenge his sentence.

Even if the principle expressed in Hardley were to apply to the State's instant challenge, its claim could not be construed as challenging Whitener's sentence as illegal. Thus, any such claim would be subject to Ind. Appellate Rule 9(A) and the appeal must be brought within thirty days after the entry of a final judgment.

For the foregoing reasons, we affirm Whitener's conviction for burglary as a class A felony and the court's order that Whitener must register as a sex offender as a condition of probation, and we dismiss the State's claim that the court erred in merging Count II into Count I based upon double jeopardy principles.

Affirmed.

BAILEY, J., and VAIDIK, J., concur.